**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| My Pillow, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Ontel Products Corporation, Target Corporation, Pegasus Home Fashions, Inc., and Does 1 through 7, <br><br> Defendants. | Civil No. 19-cv-903 (JNE/HB) <br><br><br> **REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on Plaintiff's Motion for an Expedited Preliminary Injunction [Doc. No. 49]. On November 20, 2019, the Honorable Joan N. Erickson, U.S. District Judge, denied Plaintiff's request for expedited handling of its motion. [Doc. No. 58.] Subsequently, the motion was referred to this Court for a report and recommendation in an Order of Referral dated December 10, 2019. [Doc. No. 64.] The Court held a hearing on the motion on January 30, 2020. [*See* Doc. No. 77.] For the reasons set forth below, the Court recommends that the motion be denied.

**I.    Background**

Plaintiff My Pillow, Inc. is a Minnesota corporation that primarily makes and sells pillows under the brand name "MyPillow." (*See* Lindell Decl. ¶ 2 [Doc. No. 55].) The MyPillow is a personal pillow made of shredded polyurethane foam fill. (*Id.* ¶ 13.) It was developed by Mike Lindell, the company's founder and CEO, and has been marketed

extensively through tradeshows, print media, and television and internet infomercials.

(*Id.* ¶¶ 2–5.)  In connection with its marketing strategy, Plaintiff registered as a trademark

its product's slogan, "GUARANTEED THE MOST COMFORTABLE PILLOW

YOU'LL EVER OWN!" (hereafter referred to as the "Most Comfortable Pillow Mark").[1]

(*Id.* ¶ 9.)  Plaintiff has used its slogan continuously since 2005 and registered the mark on

October 9, 2012.  (*Id.*)  Plaintiff also has a registered copyright for a photograph of Mike

Lindell holding a MyPillow, a version of which appears on the MyPillow packaging.  (*Id.*

¶ 11.)

Defendant Ontel sells a variety of consumer products, including pillows.  (Wade

Decl. ¶¶ 3–4, 8–20 [Doc. No. 69].)  In 2014, Ontel registered a trademark for its

"MIRACLE BAMBOO" pillow.  (*Id.* ¶ 8.)  In 2018, it began producing another pillow,

which it named the "Miracle Pillow."  (*Id.* ¶¶ 15–17.)  Plaintiff initiated this lawsuit

against Ontel on April 1, 2019, alleging that the packaging and trade dress Ontel used for

the Miracle Pillow infringed Plaintiff's trademark and trade dress for the MyPillow,

among other things.  [Doc. No. 1.]  Plaintiff later amended its complaint to include

additional defendants.  [Doc. No. 9.]

Plaintiff makes four claims pertinent to this motion.  First, Plaintiff asserts

Defendants' use of the slogan "The Most Comfortable Pillow . . . Ever!" on the Miracle

Pillow packaging infringes Plaintiff's Most Comfortable Pillow Mark.  (Am. Comp.

¶¶ 66–71.)

_____

[1]  Plaintiff has also registered as a trademark the name "MYPILLOW."  (Lindell Decl.
¶ 9.)  That mark is not implicated in this matter.

Second, Plaintiff alleges the packaging of the Miracle Pillow infringes Plaintiff's rights in the trade dress of the MyPillow.  The MyPillow is sold in a box of approximately the same dimensions of the pillow, with a handle on the top.  The packaging includes the following features: (1) the product name, MyPillow, on the front of the box, on the left side; (2) an image of Mike Lindell holding a MyPillow in his arms and smiling at the camera; (3) a blue background with gradient coloring; (4) the Most Comfortable Pillow Mark on the front of the box, centered at the top; and (5) a list of four descriptions of the pillow, such as "Patented Adjustable Fill" and "Will Not Go Flat." The box also includes a graphic representing the pillow's 10-year warranty, an American flag icon that says "Made in the U.S.A.," and several green banners containing further descriptions of the product.



Defendants also sell the Miracle Pillow in a box with a handle.  Plaintiff points out that Ontel's packaging also includes: (1) the product name, Miracle Pillow, on the front of the box, on the left side; (2) an image of a person holding a pillow; (3) a blue gradient background; (4) the slogan "The Most Comfortable Pillow . . . Ever!" running along the front, top of the box; and (5) a list of four descriptions of the pillow, including "Special

Interlocking Fill" and "Won't Go Flat."  Defendants' pillow box also includes a graphic

indicating that the pillow comes with a 10-year warranty, an American flag icon that says

"Made in the USA," and a green banner with the pillow's dimensions.



Third, Plaintiff alleges that the photograph of the person holding a pillow on the

Miracle Pillow box is derivative of, and therefore infringes, Plaintiff's copyrighted image

of Mike Lindell holding a MyPillow.  (Lindell Decl. ¶ 11.)  Although the image has

changed from time to time since it was originally registered, it has always featured Mike

Lindell holding a MyPillow, wearing a blue, collared shirt and smiling at the camera.

(*See* original image Pl.'s Mem. Supp. Mot. at 4 [Doc. No. 54]; image variations Def.

Mem. Opp'n Mot. at 35 [Doc. No. 66].)

Fourth, Plaintiff alleges that Defendants engaged in deceptive trade practices

under the Minnesota Deceptive Trade Practices Act (Minn. Stat § 325D.44).

By this motion, Plaintiff seeks a preliminary injunction prohibiting Defendants

from selling the Miracle Pillow in the allegedly infringing packaging.

## II.    Discussion

"A preliminary injunction is an extraordinary remedy never awarded as of right."

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). In determining whether to grant a preliminary injunction, the Court considers the following four factors: (1) the likelihood of the movant's ultimate success on the merits; (2) the likelihood—not just the possibility—of irreparable harm to the movant in the absence of relief; (3) the balance of equities; and (4) whether an injunction is in the public interest. *See Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *Winter*, 555 U.S. at 20, 22. "The party seeking injunctive relief bears the burden of proving these factors." *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006).

### A.      Likelihood of Plaintiff's Success on the Merits

Although no single factor is determinative, courts weigh heavily the likelihood of Plaintiff's success on the merits. *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013). The moving party must demonstrate a "fair chance of prevailing," *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008), and "the absence of a likelihood of success on the merits strongly suggests that preliminary relief should be denied," *CDI Energy Srvs., Inc. v. West River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009).

Plaintiff has raised four claims, but it "need only show likelihood of success on the merits on a single cause of action, not every action it asserts in its complaint." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018). The Court will address the merits of each of Plaintiff's claims in turn.

### 1.      Plaintiff's Trademark Infringement Claim

First, Plaintiff argues the Miracle Pillow's slogan infringes its own trademarked

slogan.  To establish a claim for trademark infringement, a plaintiff must show that: (1) it has a valid, protectable trademark, and (2) the unauthorized use of that trademark creates a likelihood of confusion.  *Jeld-Wen, Inc. v. Dalco Indus., Inc.*, 1999 WL 1024002, at *2 (8th Cir. Nov. 10, 1999).  Plaintiff's mark is incontestable because more than five years have elapsed since its federal registration.  (Lindell Decl. ¶ 9.)  Once a mark has become incontestable, its validity is presumed.  *Dakota Indus. Inc. v. Ever Best Ltd.*, 28 F.3d 910, 912 (8th Cir. 1994).  Therefore, the likelihood of Plaintiff's success on its trademark claim turns on the second factor, the likelihood of consumer confusion.

In considering whether use of a mark creates a likelihood of confusion, courts analyze six non-exclusive factors:

> (1) the strength of the owner's mark; (2) the similarity of the owner's mark and the alleged infringer's mark; (3) the degree of competition between the products; (4) the alleged infringer's intent to "pass off" its goods as the trademark owner's; (5) incidents of actual confusion; and, (6) the type of product, its cost, and conditions of purchase.

*Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 759–60 (8th Cir. 2005).[2]

### a.    Strength of the Mark

The strength of a mark generally depends on the distinctiveness of the mark and the extent to which the mark is recognized by consumers.  *Eniva Corp. v. Glob. Water Sols., Inc.*, 440 F. Supp. 2d 1042, 1050 (D. Minn. 2006).  A strong and distinctive mark is entitled to greater protection than a weak mark.  *Squirt Co. v. Seven-Up Co.*, 628 F.2d

---

[2]  These factors are commonly referred to as the "*Squirt Co.* factors," after the Eighth Circuit's decision in *Squirt Co. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).

1086, 1091 (8th Cir. 1980). Determining that a mark is weak "means that consumer confusion has been found unlikely because the mark's components are so widely used that the public can easily distinguish slight differences in the marks, even if the goods are related." *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir. 1987) (affirming finding of district court that trademark owner had failed to show likelihood of consumer confusion between "Apple Raisin Crisp" and "Oatmeal Raisin Crisp").

Marks are generally categorized as (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *Cellular Sales, Inc. v. Mackay*, 942 F.2d 483, 485 (8th Cir. 1991). A generic term is not protectable as a trademark. A descriptive mark "designates the characteristics, qualities, or features of the product." *Fair Isaac Corp. v. Experian Info. Sol.*, 645 F. Supp. 2d 734, 757 (D. Minn. 2009). A descriptive term is "the weakest protectable mark." *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005).

The Eighth Circuit has been clear that self-laudatory marks—those that indicate "superior quality"—are considered descriptive. *Jeld-Wen, Inc.*, 1999 WL 1024002 at *3 (finding that the mark "Elite 4000" was self-laudatory). Plaintiff's mark is clearly self-laudatory. In using the phrase "most comfortable" in connection with a bed pillow, Plaintiff is describing the "superior quality" of its pillow.[3] Plaintiff's mark is therefore a descriptive mark, the weakest possible variety of mark.

Plaintiff presented little or no evidence of the strength of its mark, i.e., the extent

---

[3] This point is underscored by the frequent use of the phrase "most comfortable pillows" in the title and content of online articles rating the quality of bed pillows. (*See* Artz Decl. Ex. 7 [Doc. No. 67 at 55], compiling examples.)

to which its trademarked slogan is recognized as a source identifier by the relevant consumer class.  Plaintiff did offer evidence of its advertising expenditures for the MyPillow product generally, representing that it has spent "thousands of hours" and "over $5,000,000 per month" on product marketing (Lindell Decl. ¶¶ 8, 10), but that evidence does not indicate what proportion of those expenditures went toward advertising that featured the Most Comfortable Pillow Mark, nor does it describe the number of commercial impressions generated by those expenditures.  Plaintiff offered no other evidence (such as, for example, the results of consumer surveys) to support a conclusion about the extent to which consumers recognize the mark and view it as a source identifier.

Instead, Plaintiff seems to argue the Court must assume its mark is strong because it is incontestable.  (Pl.'s Mem. Supp. Mot. at 19.)  But incontestability only precludes the accused infringer from arguing the mark is invalid for lack of acquired secondary meaning;[4] it does not establish that the mark is strong.  On the contrary, incontestable marks can still be weak marks.  *DowBrands, L.P. v. Helene Curtis, Inc.*, 863 F. Supp. 963, 966 n.3 (D. Minn. 1994).  That is, "a descriptive trademark, although it has become incontestable, may still be only entitled to minimal protection."  *Id.*

In view of the highly descriptive nature of the Most Comfortable Pillow Mark and the absence of affirmative evidence of the strength of the mark other than generalized

---

[4] "Secondary meaning is an association formed in the minds of consumers between the mark and the source or origin of the product."  *Frosty Treats Inc. v. Sony Computer Entm't Am. Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005).

evidence of advertising expenditures, the Court finds this factor favors Defendants.

### b.       Similarities Between the Marks

To determine the similarity between marks the Court considers "the marks' visual, aural, and definitional attributes and compare[s] the trade dress of the products in determining whether the total effect conveyed by the two marks is confusingly similar." *Sensient Tech. Corp. v. Sensory Effects Flavor Co.*, 613 F.3d 754, 764 (8th Cir. 2010). In analyzing these similarities, the Court "must look to the overall impression created by the marks and not merely compare individual features." *Gen. Mills, Inc.*, 824 F.2d at 627.

There are clear similarities between Ontel's slogan ("The Most Comfortable Pillow . . . Ever!"), and Plaintiff's mark ("Guaranteed the Most Comfortable Pillow You'll Ever Own!"). The slogans have several words in common and both end with an exclamation point. But that does not end the analysis since "the use of identical, even dominant, words does not automatically equate to similarity between the marks." *Id.* What's more, there are obvious differences between the two slogans. The Most Comfortable Pillow mark starts with the word "Guaranteed" and adds the qualifier "You'll Ever Own." Defendants' slogan involves an ellipsis, which makes it visually distinctive. The marks are also presented on the packaging in different fonts, colors, sizes, and number of lines of text. In addition, they are presented adjacent to the clearly displayed—and clearly different—names of the products themselves.

Despite some evident similarities among the slogans' "individual features," the Court cannot conclude based on the record before it that the "total effect" of the two phrases is "confusingly similar." *Sensient Tech. Corp.*, 613 F.3d at 764; *Gen. Mills, Inc.*,

824 F.2d at 627.  This factor favors Defendants.

### c.      The Degree of Competition Between the Products

When products are in close competition, "less similarity in the trademarks is necessary to support a finding of infringement."  *ConAgra, Inc. v. George A. Hormel & Co.*, 990 F.2d 368, 371 (8th Cir. 1993).  The evidence indicates that the MyPillow and the Miracle Pillow are in close competitive proximity.  Both products are personal pillows. They are sold through several of the same retailers, and at similar price points.  (*See* Spence Decl., Ex. 3 [Doc. No. 73-3]; Def. Mem. Opp'n Mot. at 19; Artz Decl. Ex. 9 [Doc. No. 67 at 165].)  This factor favors Plaintiff.

### d.      Intent to Pass Off

The Court may consider "whether the alleged infringer intended to pass off its goods as the trademark owner's goods" as evidence of a likelihood of confusion. *Sensient Tech. Corp.*, 613 F.3d at 766.  In *Aveda Corp. v. Evita Marketing*, the court inferred the defendant had an intent to pass off its goods as that of its competitor because the defendant was aware of the plaintiff's mark, "Aveda," when, out of "the infinite number of possible marks," it chose to market its products with a word pronounced very similarly, "Avita."  706 F. Supp. 1419, 1429–30 (D. Minn. 1989).  The *Aveda* plaintiff supported this inference with several affidavits documenting further misrepresentations by the defendant, such as statements that the competing products were made by the same company or contained "basically the same ingredients."  *Id.* at 1430.  The court concluded the "evidence clearly demonstrates an intent on the part of defendants to trade on Aveda's good will."  *Id.*

10

Plaintiff is asking the Court to infer that Defendants intended to pass off the Miracle Pillow because Ontel had knowledge of Plaintiff's mark when it developed the marketing for the Miracle Pillow.  (*See* Wade Decl. ¶¶ 13–21.)  But "[k]nowledge of another's product and an intent to compete with that product is not . . . equivalent to an intent . . . to mislead and to cause consumer confusion."  *Gen. Mills, Inc.*, 824 F.2d at 627.  The situation here is unlike that in *Aveda*.  As discussed above, the Plaintiff's mark is highly descriptive and includes words that are in common use to extol the attributes of bed pillows, while the Aveda mark was not at all descriptive.  Therefore, the inference that the defendant in *Aveda* must have had that mark in mind when it chose the mark "Avita" cannot be extrapolated to this case.  And Plaintiff has not offered any relevant evidence beyond Defendants' knowledge of Plaintiff's product and mark to support its claim that Defendants intended to pass off the Miracle Pillow to consumers as a MyPillow.  Plaintiff argues that it is Ontel's "unfortunate strategy to usurp others' intellectual property rights," and offers, as purported evidence of that strategy, citations to recent lawsuits in which Ontel's products have been accused of infringing another's intellectual property.  (Pl.'s Mem. Supp. Mot. at 9; Pl.'s Reply at 4–5 [Doc. No. 72].) The Court declines to draw inferences about what happened in the case before it based on what a defendant has been accused of doing elsewhere.  The Court concludes this factor favors Defendants.

### e.  Evidence of Actual Confusion

Evidence of actual confusion is not necessary for a finding that a likelihood of confusion exists, but it is "perhaps the most effective way to prove a likelihood of

CASE 0:19-cv-00903-JNE-HB   Doc. 83   Filed 04/03/20   Page 12 of 26

confusion." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602–03 (8th Cir. 1999). Plaintiff has failed to provide any evidence of actual confusion. Instead it says only "it is likely such confusion would occur, and increase."[5] (Pl.'s Mem. Supp. Mot. at 22.) This factor favors Defendants.

### f.      Degree of Care Expected of Consumers

The sixth factor evaluates product-specific criteria, such as the type of product, its cost, and conditions of purchase. *Everest Cap. Ltd.*, 393 F.3d at 760. Some courts articulate this factor as an inquiry into "the degree of care expected of an ordinary purchaser." *See Duluth News-Tribune v. Mesabi Pub. Co.*, 84 F.3d 1093, 1099 (8th Cir. 1996). Courts tend to agree that consumers exercise a lesser degree of care when purchasing lower cost items. *E.g.*, *J & B Wholesale Distrib., Inc. v. Redux Beverages*, LLC, 621 F. Supp. 2d 678, 687 (D. Minn. 2007); *Eniva Corp.*, 440 F. Supp. 2d at 1051– 52.

Defendants' pillow sells for $29.95. (Def. Mem. Opp'n Mot. at 19.) The MyPillow is sold at a similar, if slightly higher, price point. (*See* Artz Decl. Ex. 9 (listing the promotional price of two MyPillows for $69.98).) While this is not a negligible amount of money, neither is it in a league with the purchase of a television or a car, or even of higher priced specialty bed pillows. Thus, the Court cannot conclude that the price point of the parties' products is at such a level that consumers would exercise a particularly high degree of care when making their purchase. The Court concludes this

---

[5] The Court also notes that Plaintiff has offered no survey evidence tending to show likelihood of confusion.

factor slightly favors Plaintiff.

The Court has found that four of the six factors favor Defendants, one clearly favors Plaintiff, and the other slightly favors Plaintiff.  Plaintiff has not offered any evidence of actual consumer confusion, or of Defendants' alleged intent to mislead consumers.  The mark in question is only descriptive, and therefore entitled to a narrower scope of protection, and Defendants' slogan, while similar, contains enough differences that the total effect is not confusingly similar to Plaintiff's mark.  Only one factor, the degree of competition between the parties' products, weighs clearly in Plaintiff's favor, but that alone is not enough to show a likelihood of consumer confusion.  Absent such a showing, on this record, Plaintiff has not demonstrated that it is likely to succeed on the merits of its trademark claim.[6]

## 2.    Plaintiff's Trade Dress Infringement Claim

Plaintiff's next claim is that Defendants infringed its trade dress under 15 U.S.C. § 1125(a).  Trade dress—a product's packaging or "dressing"—protects the "total image of a product, the overall impression created, not the individual features."  *Munro v. Lucy Activewear Inc.*, 899 F.3d 585, 589 (8th Cir. 2018); *see also Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000).  Courts apply the "general principles" of trademark protection to determining whether trade dress is entitled to protection.  *Wal-Mart Stores, Inc.*, 529 U.S. at 210; *see also Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d

---

[6]  Because it has concluded that Plaintiff is unlikely to succeed on its trademark infringement claim, the Court does not reach Defendants' additional arguments, that Ontel's slogan is permitted under the "fair use" doctrine, or that the equitable doctrine of laches precludes Plaintiff from enforcing its mark.

863, 868 (8th Cir. 1994) ("The difference between trade dress and trademark is no longer of importance in determining whether trade dress is protected by federal law.")  In order to form a basis for an action, trade dress need not be registered, but it must be: (1) distinctive; (2) nonfunctional; and (3) likely to "be confused with the accused product."  *Munro*, 899 F.3d at 589; *Aromatique, Inc.*, 28 F.3d at 868.

### a.    Distinctiveness

A distinctive trade dress "is one that is capable of identifying the source of goods because it is either inherently distinctive or, if not inherently distinctive, has acquired distinctiveness by acquiring secondary meaning."  *Aromatique, Inc.*, 28 F.3d at 869. Trade dress that "conveys an immediate idea of the ingredients, qualities, or characteristics of the goods" or that is "dictated by the nature of the product" is not distinctive.  *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 785–86 (8th Cir. 1995). Likewise, trade dress that is "a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods" is not inherently distinctive.  *See Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1042 (D. Minn. 2003) (quoting *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A. 1977).  Courts focus the trade dress analysis "on a comparison of plaintiff's trade dress to others in the same class of goods, not on the trade dress' impact on consumers."  *Id.*

Plaintiff has alleged that there are numerous elements that make up its trade dress, including an image of a person hugging a pillow, a gradient blue background, a list of four short phrases describing the pillow's attributes, and a box with a white handle.  (Pl.'s Mem. Supp. Mot. at 25–26.)  But none of these elements is inherently distinctive, and

14

indeed, Plaintiff has not even attempted to show how its trade dress compares to others in the same class of goods. *Goddard, Inc.*, 291 F. Supp. 2d at 1042. Instead, it is apparent that many of the characteristics Plaintiff identifies as specific to its product are common in its industry. Defendants proffered numerous examples of pillows being sold in boxes with handles, featuring blue as a dominant color in the color scheme, and with images of individuals touching or cuddling a pillow. (*See* Def. Mem. Opp'n Mot. at 30.) Other aspects of Plaintiff's trade dress, such as its list of four phrases or its Made in the U.S.A. icon, might be less common, but are unprotectable on the grounds that they only serve to convey an idea of "the ingredients, qualities, or characteristics of the goods." *Stuart Hall Co., Inc.* 51 F.3d at 785–86. None of the elements of Plaintiff's trade dress—let alone the sum of their parts—is inherently distinctive.

The Court turns to the second way in which trade dress may be viewed as distinctive, via an acquired secondary meaning. As already discussed, "[s]econdary meaning is an association formed in the minds of consumers between the mark and the source or origin of the product." *Frosty Treats*, 426 F.3d at 1005. In order to establish secondary meaning, Plaintiff "must show that by long and exclusive use [of the trade dress] in the sale of the user's goods, [it] has become so associated in the public mind with such goods that the [trade dress] serves to identify the source of the goods and to distinguish them from those of others." *Aromatique, Inc.*, 28 F.3d at 869.

Plaintiff has not offered any evidence, such as consumer surveys or testimony, to support its claim that its trade dress has acquired this secondary meaning for consumers. *See id.* at 871. Instead, it argues only that its trade dress is "pervasive" because of its

15

extensive, "ever-present" advertising campaign, such that it "undoubtedly . . . has established consumer recognition."  (Pl.'s Mem. Supp. Mot. at 27.)  But while an extensive advertising budget provides some evidence that the trade dress being advertised may have acquired secondary meaning, Plaintiff's evidence here falls short.  There is no evidence about the extent of Plaintiff's advertising expenditures, let alone the commercial impressions generated by those expenditures, *with respect to the particular trade dress at issue here*.  Plaintiff says that its expenditures were for "advertising featuring its trade dress" (Lindell Decl. ¶ 10), but precisely *which* trade dress is uncertain, as the evidence shows Plaintiff did not use the elements of its trade dress consistently.  Core elements of Plaintiff's trade dress—such as its gradient blue background, the location and phrasing of the Most Comfortable Pillow Mark, and its use of Mike Lindell's photograph—have varied from package to package and from advertising impression to advertising impression.  (*See* Artz Decl. Exs. 13–18; Slocum Decl. Ex. 1.)  Indeed, Plaintiff's counsel acknowledged at oral argument that he could not specify the proportion of Plaintiff's advertising expenditures that featured this particular trade dress.  (Mot. Hr'g Tr. at 22 [Doc. No. 79].)  As a result, the Court cannot conclude such advertising expenditures successfully established a secondary meaning in the minds of consumers as to this particular trade dress.  More generally, lack of consistent application of the alleged trade dress undermines any argument that its packaging has become associated with Plaintiff in the mind of the consumer.  *See Goddard, Inc.*, 291 F. Supp. 2d at 1045.[7]

---

[7]  The only aspect of Plaintiff's branding that the current evidence suggests is likely to have acquired a secondary meaning is Plaintiff's consistent use of a photograph of Mike

Accordingly, the Court concludes that Plaintiff has failed to show its trade dress is either inherently distinctive or has become distinctive by virtue of having acquired a secondary meaning, and therefore it cannot show it is likely to succeed on the first element of its trade dress infringement claim.

### b.    Functionality

Trade dress is nonfunctional if "it is an arbitrary embellishment primarily adopted for purposes of identification and individuality." *Aromatique, Inc.*, 28 F.3d at 873. By contrast, "if the design elements of a trade dress are essential to others attempting to compete in a given business, then the trade dress as a whole is functional and unprotected." *Rainforest Cafe, Inc. v. Amazon, Inc.*, 86 F. Supp. 2d 886, 894 (D. Minn. 1999); *see also Aromatique, Inc.*, 28 F.3d at 874 (finding clear cellophane packaging of potpourri to be functional), *Goddard Inc.*, 291 F. Supp. 2d at 1049 (finding sneeze guards and countertops at a self-serve deli to be functional). The question for the Court is "whether protection of the feature would hinder competition or impinge upon the rights of others to compete effectively in the sale of goods." *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 n.6 (8th Cir. 1990).

Because the Court has found that Plaintiff is unlikely to succeed on the first element of a claim for trade dress infringement, it need not address whether the MyPillow trade dress is nonfunctional. It notes, however, that Plaintiff would have significant

---

Lindell, its CEO in its advertising. Surely if any part of the pillow packaging has become memorable and distinctive in the minds of consumers, it is this one. But Plaintiff does not argue that Defendants' packaging featured an image of Mike Lindell, or anyone who looks even remotely like Mr. Lindell, on its pillow box.

challenges as to this element as well.  Certain elements, such as the pillow box's

dimensions and handle, or its Made in the U.S.A. graphic, are obviously non-arbitrary

elements of the trade dress, included for functional reasons rather than "for purposes of

identification and individuality."  *Aromatique, Inc.*, 28 F.3d at 873.  But the same could

be said about other, less-obvious aspects of the pillow's packaging, such as its blue

background or its image of a person hugging a pillow—both commonly used in the

pillow industry.  (*See* Def. Mem. Opp'n Mot. at 30; Slocum Decl. Ex. 2.)

### c.    Consumer Confusion

Again, because the Court has found Plaintiff is unlikely to succeed in showing that

its trade dress is distinctive and therefore protectable, the Court need not reach the third

element, whether there is a likelihood that Defendants' pillows will be confused with

those of Plaintiff because of a similarity in trade dress.  *See Aromatique, Inc.*, 28 F.3d at

874.  But the Court notes that Plaintiff's evidence on the likelihood of confusion as to

trade dress is lacking for many of the same reasons discussed above in the analysis of its

trademark claim.  As above, Plaintiff has not provided evidence that its packaging is

strongly (if at all) associated with its source (*Squirt Co.* factor 1), or that Defendants'

pillow box is similar in ways that are likely to engender confusion (*Squirt Co.* factor 2).

Likewise, there is no evidence that Ontel chose its trade dress with the intent to 'pass off'

its pillow to consumers as that of Plaintiff (*Squirt Co.* factor 4), or that any consumers

have actually been confused by the similarity in the trade dress of the two products

(*Squirt Co.* factor 5).  In short, Plaintiff has not demonstrated it is likely to succeed in

showing consumer confusion is likely to occur if Defendants continue selling the Miracle

Pillow in its current packaging.

Accordingly, the Court finds Plaintiff has not demonstrated it is likely to succeed on the merits of its trade dress claim.

### 3.    Plaintiff's Copyright Infringement Claim

Plaintiff's third claim is for infringement of its copyright in the photograph of Mike Lindell holding a MyPillow.  (*See* Mike Lindell Decl. ¶ 11.)  A version of that photograph is featured prominently on all MyPillow boxes.  (*Id.*)

To prevail on a copyright infringement claim, a plaintiff must prove: (1) its ownership of a valid copyright, (2) the alleged infringer had access to the copyrighted material, and (3) substantial similarity between the two works.  *Frye v. YMCA Camp Kitaki*, 617 F.3d 1005, 1007–08 (8th Cir. 2010); *see also Bar-Meir v. N. Am. Die Cast Ass'n*, 176 F. Supp. 2d 944, 949 (D. Minn. 2001).

Here, Plaintiff does not claim that Defendants have copied the photograph of Mike Lindell outright, but rather that the image on the Miracle Pillow box, that of a woman holding a pillow, is derivative of Plaintiff's copyrighted work.  (Pl.'s Mem. Supp. Mot. at 31.)  Since only copyright owners have the right to create derivative works, the use of a derivative work without permission of the copyright holder is infringement.  *Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849, 852 (8th Cir. 2004).  For a derivative work to infringe a copyright, "the infringing work must incorporate in some form a portion of the copyrighted work."  *Bar-Meir*, 176 F. Supp. 2d at 949 (citing *Litchfield v. Spielberg*, 763 F.2d 1352, 1357 (9th Cir. 1984).

The ownership and validity of Plaintiff's copyright over its photograph of Mike

Lindell is not in dispute.  (Lindell Decl. Ex. A.)  Likewise, Defendants do not dispute that they had access to the photograph of Mike Lindell holding a MyPillow, as it is distributed widely.  Plaintiff's copyright infringement claim therefore turns on whether there is substantial similarity between the two images.

It is well established that copyright protection does not cover ideas, but rather the expression of those ideas.  *E.g.*, *Frye*, 617 F.3d at 1008.  Furthermore utilizing "incidents, characters, or settings which are, as a practical matter indispensable, or at least standard, in the treatment of a given topic," is not infringing conduct.  *Taylor Corp. v. Four Seasons Greetings, LLC*, 315 F.3d 1039, 1042 (8th Cir. 2003).  Such "stock elements" are not protectable with a copyright.  *Id.*

The similarities between Plaintiff's image and Defendants' image are limited:  Both depict an adult person holding a white pillow, right hand over left, on the right side of their body.  (Pl.'s Mem. Supp. Mot. at 24–25.)  They are otherwise dissimilar.  Most obviously, Plaintiff utilizes a photograph of its founder, an adult man in business attire with short dark hair.  (*Id.*)  Indeed, the MyPillow box specifically identifies the person in the photo by name and describes him as "Inventor & CEO."  (*Id.*)  Defendants use a generic photograph of an attractive, long-haired woman who is apparently wearing pajamas.  (*Id.*)  In Plaintiff's photograph, Lindell is looking at the camera while holding the pillow up, as if he is displaying the product; the woman in the Defendants' image has her eyes closed and her face pressed against the pillow, as if she is asleep.  (*Id.*)  More importantly, Plaintiff offers no evidence suggesting that the elements the photographs have in common—people holding or hugging pillows—are not "stock elements,"

commonly used in marketing pillows. *See* Def. Mem. Opp'n Mot. at 44–45. The Court does not find a substantial similarity between the images beyond these standard elements, such that Defendants' image could be described as derivative of Plaintiff's. The Court therefore concludes that Plaintiff has not shown it is likely to succeed on the merits of its copyright claim.

### 4.    Plaintiff's Deceptive Trade Practice Claim

Claims of trademark or trade dress infringement under Minnesota law are analyzed similarly to such claims under federal law. *See DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 936, n.3 (8th Cir. 2003) (collecting cases finding that the state and federal claims are coextensive); *Eyebobs, LLC v. Snap, Inc.*, 259 F. Supp. 3d 965, 979 (D. Minn. 2017).

Plaintiff invokes the following provisions of the Minnesota Deceptive Trade Practices Act:

> Subdivision 1: A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
> (1) passes off goods or services as those of another;
> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; [or] . . .
> (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

Minn. Stat. § 325D.44, subd. 1. Because these claims mirror elements of Plaintiff's trademark and trade dress claims, the Court does not reiterate its analysis here. It concludes here, as it did with regard to Plaintiff's federal trademark and trade dress infringement claims, that Plaintiff has failed to show a likelihood of success on the merits of its Minn. Stat. § 325D.44 claim.

The Court has found that Plaintiff has not established a likelihood of success on the merits for any of its claims. Accordingly, the first *Dataphase* factor weighs strongly against granting a preliminary injunction.

**B.    Likelihood of Irreparable Harm**

The second factor courts consider in determining whether to grant preliminary injunctive relief is the threat of irreparable harm to the moving party—here, Plaintiff. "Regardless of the strength of its claim on the merits, a movant for a preliminary injunction should show a threat of irreparable harm." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 318 (8th Cir. 2009). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Id.* at 319. "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996).

Plaintiff argues that irreparable harm should be presumed in a trademark case where likelihood of success on the merits is demonstrated. (Pl.'s Mem. Supp. Mot. at 14 (citing *Calvin Klein Cosmetics Corp. v. Lenox Labs, Inc.*, 815 F.2d 500, 505 (8th Cir. 1987), among others).) In the wake of the Supreme Court's decision in *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 392–93 (2006), it is questionable whether it is proper to presume irreparable harm in any case. Although *eBay* was a patent case, its holding has been extended to other intellectual property cases, including trademark infringement cases. *See, e.g.*, *TrueNorth Co., L.C. v. TruNorth Warranty Plans of N. Am., LLC*, 353 F.

22

Supp. 3d 788, 801 (N.D. Iowa 2018) ("Without additional guidance from the Eighth

Circuit on this issue, I find it prudent to consider irreparable harm under the traditional

analysis (requiring plaintiff to show more than a possibility of harm), without allowing

for a presumption based on likelihood of success.")  But the Court need not determine

here whether the presumption of irreparable harm applies when likelihood of success on

the merits has been shown because it has concluded Plaintiff has not established a

likelihood of success on the merits of any of its claims.  *See, e.g.*, *City Cycle IP LLC v.

Caztek, Inc.*, Case No. 12-cv-1285 (JNE/SER), 2012 WL 3656443 at *3–*4, n.6 (D.

Minn. Aug. 24, 2012) (noting that although "it is not clear whether it is still proper to

presume irreparable harm" after *eBay*, the plaintiff was not entitled to such a presumption

in any event because it had failed to demonstrate a likelihood of success on the merits of

its case).

Turning to Plaintiff's arguments in support of irreparable harm, Plaintiff argues

that Defendant's pillow is inferior to its own because the Miracle Pillow uses "a

substantial amount of polyester fiber fill" in addition to shredded foam, whereas the

MyPillow fill is made up entirely of "virgin" foam.  (Lindell Decl. ¶ 13.)  As a result,

"the Miracle Pillow will not be adjustable to the same degree as the MyPillow, will not

hold its shape as well as the MyPillow, and will not keep the customer's neck aligned

while sleeping as well as the MyPillow does."  (*Id.*)  Plaintiff surmises that if a customer

is confused into purchasing a Miracle Pillow rather than a MyPillow and experiences this

inferior quality, the goodwill and reputation for quality that Plaintiff has built will be

eroded.  Without a preliminary injunction, Plaintiff argues, "[c]onsumer confusion will

23

undoubtedly increase" and Defendants "will have the benefit of trading off, and eroding, MyPillow®'s goodwill and product recognition."  (Pl.'s Mem. Supp. Mot. at 16.)

But here, as elsewhere, Plaintiff fails to adduce any evidence to support its arguments.  It has not shown that consumers have been confused or are likely to be confused by the Miracle Pillow slogan or trade dress (let alone that such confusion will *increase*) or that Plaintiff's goodwill and reputation have been, are being, or will in the future be negatively affected.  The Court will not recommend granting an injunction— "an extraordinary remedy never awarded as of right"—on Plaintiff's speculation alone. *Winter*, 555 U.S. at 24.

### C.    Balance of Equities

The third *Dataphase* factor of the preliminary injunction analysis weighs the potential harm caused to the defendant if an injunction is granted against that caused to the plaintiff if the injunction is denied.  640 F.2d at 114.  Plaintiff seeks an injunction to prohibit Defendants from using the current packaging of the Miracle Pillow.  (Pl.'s Reply at 13.)  To grant the injunction would require Ontel to redesign and repackage its remaining inventory of Miracle Pillows or else cease its sales entirely.  Plaintiff argues this is vital to preventing harm to its goodwill, reputation, and company caused by the alleged infringement, and would harm Defendants only in "purely monetary" ways, if at all.  (Pl.'s Mem. Supp. Mot. at 32.)  Plaintiff also points out that the MyPillow is its "keystone product," whereas Ontel sells many other products not implicated by this suit.  (*Id.*)  Defendants argue this factor weighs in their favor since a preliminary injunction would require Ontel to "cease sales of a noninfringing and legitimate product."  (Def. Mem.

Opp'n Mot. at 52.)

The Court acknowledges that the harms Plaintiff foresees are indeed significant—if they were to occur. But as already discussed, Plaintiff has failed to make any showing as to the likelihood of reputational harms, or any harms, for that matter. Plaintiff has not shown a likelihood of success on any of its claims against Defendants. "[W]here, as here, the party moving for preliminary injunctive relief has failed to adequately show a likelihood of success on the merits, it faces a particularly heavy burden of demonstrating that the equities nevertheless militate in favor of granting the requested relief." *F.T.C. v. Freeman Hosp.*, 69 F.3d 260, 272 (8th Cir. 1995). Moreover, harm to a defendant is not inconsequential simply because it is "purely monetary." *See Vision-Ease Lens, Inc. v. Essilor Intern. SA*, 322 F. Supp. 2d 991, 999 (D. Minn. 2004); *Cargo Protectors, Inc. v. American Lock Co.*, 92 F. Supp. 2d 926, 935 (D. Minn. 2000); *Multi-Tech Systems, Inc. v. Hayes Microcomputer Products, Inc.*, 800 F. Supp. 825, 843 (D. Minn. 1992). The Court thus concludes that the balance of the hardships factor weighs in favor of denying Plaintiff's request for a preliminary injunction.

### D. Public Interest

Both parties raise strong public interest arguments. On the one hand, Plaintiff is correct that trademark infringement and unfair competition are inherently contrary to the public interest. *Am. Dairy Queen Corp. v. New Line Prods., Inc.,* 35 F. Supp. 2d 727, 733 (D. Minn. 1998). On the other, the public interest values legitimate competition. *Vision-Ease*, 332 F. Supp. 2d at 999. However, where the movant has not established a likelihood of success on any claim, the weight of the public interest factor is reduced. *Fargo Elecs.,*

*Inc. v. Iris Ltd., Inc.*, No. 04-1017 (JRT/FLN), 2005 WL 1431653, at *8 (D. Minn. Mar. 8, 2005). Because Plaintiff has not established that it is likely to succeed in any of its claims, the Court concludes that the public's interest in fostering competition weighs in favor of denying Plaintiff's motion for a preliminary injunction.

### E.    Conclusion

In applying the *Dataphase* factors, the Court has found that Plaintiff is not likely to succeed on the merits of any of its claims. It has similarly not established that it would face irreparable harm if injunctive relief is not granted. The Court likewise concludes the balance of equities and public interest also favor denying Plaintiff's motion.

Accordingly, **IT IS HEREBY RECOMMENDED** that Plaintiffs' Motion for a Preliminary Injunction [Doc. No. 49], be **DENIED**.


Dated: April 3, 2020                    s/ *Hildy Bowbeer*
                                        HILDY BOWBEER
                                        United States Magistrate Judge


### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.